[Cite as *In re K.C.*, 2018-Ohio-2348.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: K.C.

C.A. No.     18CA011258

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     16JC49445

DECISION AND JOURNAL ENTRY

Dated: June 18, 2018

CALLAHAN, Judge.

{¶1}   Appellant Mother appeals the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights and awarded permanent custody of the child, K.C., to appellee Lorain County Children Services ("LCCS"). This Court affirms.

I.

{¶2}   Mother is the biological mother of a son, K.C. (d.o.b. 3/14/11). Father has never been involved in the child's life, and he has not appealed the award of permanent custody. Mother is also the biological mother of two older daughters who were placed in the custody of their maternal grandmother ("Grandmother"). LCCS became involved with K.C. after Grandmother contacted the agency to inform it that she no longer wished to maintain the younger daughter in her home. Knowing that Mother had K.C. in her home, the agency investigated in hopes of placing the younger daughter in Mother's care. During its investigation, however, LCCS became concerned about the health and well-being of K.C. The then four-year-

old child was nonverbal, and Mother and the child appeared to have no engagement with one another. Mother's affect and behavior indicated that she had mental health issues. In addition, there was almost no food in the home, and Mother was not scheduled to receive any additional monetary benefits for several days. The agency opened a case and worked informally with Mother for more than a year to help her learn how to meet the basic needs of the child to keep him safe and on track developmentally.

{¶3} Based on her mental health issues, Mother continued receiving services from a community psychiatric supportive treatment case manager at Nord Center, as well as a money management caseworker from El Centro de Servicios Sociales. Despite these services, as well as LCCS' interventions to facilitate the child's evaluation and enrollment in early education services, to counsel and redirect Mother during frequent home visits, and to assist Mother with shopping and transportation, Mother continued to struggle. Issues regarding the lack of food in Mother's home, her failure to follow through with speech services for K.C., her failure to interact with the child, and her lack of insight regarding these problems persisted.

{¶4} LCCS filed a complaint alleging neglect and dependency, but retained the child in his home with Mother. Thereafter, K.C. was adjudicated a neglected and dependent child and placed in the temporary custody of LCCS. The agency then removed K.C. from Mother's home and placed him in a foster home. Approximately ten months later, LCCS filed a motion for permanent custody. After a two-day hearing, the juvenile court issued a judgment granting permanent custody of K.C. to LCCS and terminating all parental rights. Mother filed a timely appeal in which she raises one assignment of error for review.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR BY FINDING IT WAS IN THE BEST INTERESTS OF THE CHILD K.C. TO BE PLACED IN THE PERMANENT CUSTODY OF LCCS EVEN THOUGH IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶5}** Mother argues that the juvenile court's judgment awarding permanent custody of K.C. to LCCS was against the manifest weight of the evidence.

**{¶6}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶7}** Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest

factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶8} In this case, by the plain language of her stated assignment of error, Mother purports to challenge solely the juvenile court's second-prong finding that an award of permanent custody was in the child's best interest. Rather than focusing her argument on the best interest factors, however, Mother addresses matters more relevant to the juvenile court's first-prong finding that K.C. cannot be placed with her within a reasonable time or should not be placed with her. In fact, Mother concludes her discussion by asserting that she "believes that there is not clear and convincing evidence that K.C. could not or should not be placed with her within a reasonable period of time." Because of the significant fundamental interests implicated when a parent loses custody of a child, as well as facts which are arguably relevant to both a first-prong and second-prong discussion, this Court will conduct a manifest weight analysis regarding both prongs of the permanent custody test. To the extent that Mother has raised the issue of plain error, she has failed to make any argument in that regard. Instead, she merely cites law relevant to such a discussion. Accordingly, we decline to consider whether the juvenile court committed plain error in awarding permanent custody of K.C. to LCCS.

{¶9} In its motion for permanent custody, LCCS alleged the sole first-prong ground that K.C. cannot be placed with either parent within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(B)(1)(a). In support, the agency alleged only two Subsection (E) factors relative to Mother. Specifically, it alleged that (1) Mother had "failed to substantially remedy the problems that initially caused the child to be placed outside of the home * * *, pursuant to R.C. 2151.414(E)(1);" and (2) Mother "suffers from chronic mental illness, chronic emotional illness, intellectual disability, that is so severe that it makes [her] unable to provide an adequate permanent home for the child pursuant to R.C. 2151.414(E)(2)[.]" As to Father, the agency alleged his failure to remedy problems (R.C. 2151.414(E)(1)), lack of commitment to the child (R.C. 2151.414(E)(4)), abandonment of the child (R.C. 2151.414(E)(10)), and unwillingness to provide basic necessities for the child (R.C. 2151.414(E)(14)).

{¶10} After the permanent custody hearing, the juvenile court directed the parties to file written closing arguments and proposed judgment entries. The lower court ultimately signed the proposed judgment entry submitted by LCCS.[1] As to Mother,[2] in regard to the first prong of the permanent custody test, the juvenile court made the express finding that clear and convincing evidence established that K.C. cannot be placed with either parent within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(B)(1)(a), based on (1) Mother's lack of commitment for failing to visit consistently with the child (R.C. 2151.414(E)(4)); and (2) Mother's inability to provide an adequate permanent home for the child

---

[1] Except for the reordering of two paragraphs, correcting numbering/lettering mistakes, and the deletion of a few words not significant to the judgment, the agency's proposed judgment and the juvenile court's judgment are identical.
[2] Mother does not challenge the multiple bases for the juvenile court's first-prong finding as to Father.

because of her severe chronic mental illness, chronic emotional illness, [and/or] intellectual disability (R.C. 2151.414(E)(2)). Elsewhere under its "findings of fact[,]" but without an express citation to R.C. 2151.414(E)(1), the lower court found that Mother had failed to remedy the conditions which led to the child's removal.

**{¶11}** To the extent that Mother argues that the juvenile court's finding that K.C. cannot or should not be returned to her based on her lack of commitment to the child, the argument is well taken. LCCS did not allege Mother's lack of commitment pursuant to R.C. 2151.414(E)(4). Accordingly, the juvenile court improperly based its finding, in part, on a ground not alleged by the agency.[3] *See In re J.M.*, 9th Dist. Summit No. 24827, 2010-Ohio-1967, ¶ 10-16; *see also* Juv.R. 19. This does not end the inquiry, however, as the agency's motion for permanent custody gave Mother notice of its first-prong allegation based on both R.C. 2151.414(E)(1) and (2).

**{¶12}** R.C. 2151.414(E) provides:

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot by placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied

---

[3] The error is arguably more egregious given that LCCS submitted the proposed judgment signed by the juvenile court, knowing that it had not alleged a lack of commitment by Mother.

those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the courts holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code[.]

{¶13} K.C. was substantially nonverbal when LCCS became acquainted with him at the age of four years. He exhibited both expressive speech delays, i.e., the inability to talk to communicate; and receptive speech delays, i.e., the inability to follow directions or understand language. In addition, the child presented with socio-emotional delays in that he did not respond to social cues or interact with other people as a result of Mother's failure to engage with him. K.C. had had no experience playing with other children or taking turns, so he became easily frustrated and took things from others. Finally, the child exhibited pre-academic and adaptive delays. These were evidenced by his poor fine motor skills. The child could not write or use scissors. On the other hand, his gross motor and self-help skills, e.g., dressing himself, were strong; because he was used to taking care of himself. K.C. was later diagnosed with autism.

{¶14} K.C. was placed outside Mother's home based on concerns about Mother's behaviors, stemming from mental illness and intellectual disability, which contributed to the child's significant communication, social, and adaptive delays; and hindered Mother's abilities to provide for the child's basic and special needs. Accordingly, there is great overlap in the evidence relating to the allegations arising out of both R.C. 2151.414(E)(1) and (2).

{¶15} The agency established case plan objectives designed to help Mother remedy these problems. Under the terms of the case plan, Mother was required to demonstrate that she

could meet the child's basic needs, including maintaining adequate food in the home, managing her finances effectively to provide for the child, and working with service providers for the child. Mother was further required to participate in mental health services for herself and demonstrate that she understood both her issues and the child's and that she was able to address them.

{¶16} Mother receives social security benefits based on her mental health diagnosis. Various witnesses testified that Mother was diagnosed with schizophrenia. Mother admitted mental health issues, and claimed that she had been diagnosed with bipolar disorder, but never schizophrenia. She testified that her mental health issues did not negatively impact her life and that the only problem she had was that she was sometimes afraid to leave her house. Service providers, however, testified that Mother displayed various symptoms, including a lack of insight into her issues and the child's issues, a flat affect and lack of communication, social isolation, and great difficulty managing important daily responsibilities.

{¶17} Mother has worked with a mental health case manager at Nord Center since 2008. Her current case manager helps her make psychiatric appointments, helps her do grocery shopping, and provides her with transportation. Although Mother is generally cooperative with the case manager, she requires ongoing redirection. In addition, while Mother's basic needs are being met, her mental health case manager testified that was only because of the assistance Mother receives. Mother attends her psychiatric and other mental health appointments. Although she claimed to be medication-compliant, Mother admitted to the caseworker that she sometimes takes her medication as she feels necessary, rather than as prescribed. She has consistently and continuously denied her verified schizophrenia diagnosis.

{¶18} Nord Center referred Mother to El Centro in May 2014, based on her inability to manage her finances. Mother continued to receive the services of a money management

caseworker throughout this case. El Centro, as payee for Mother's social security benefits, paid Mother's rent and utilities directly. Mother then received the remainder of her monthly benefits in two installments to ensure that she had available monies throughout the month. Nevertheless, Mother would run out of money frequently. Despite ongoing counseling by her El Centro caseworker, her Nord Center case manager, and the LCCS caseworker regarding making smart choices when shopping, Mother would buy prepared foods from a gas station at a high cost instead of utilizing lower-priced grocery stores. Even though all three of those service providers took her grocery shopping on a regular basis, Mother continued to exercise poor judgment when shopping. Even though she received a monthly "food box," Mother frequently failed to maintain enough food in her home. When counseled about the need to feed the child three meals a day, Mother rejected the advice, asserting that three meals a day was excessive. Mother informed her caseworker that one meal a day was sufficient for the child. There were times when the child had nothing but peanut butter to eat for days.

{¶19} For nearly two years, an early childhood mental health therapist from Ohio Guidestone was assigned to work with Mother and the child on a weekly basis. Before K.C. was removed from the home, the therapist worked with Mother and the child together in Mother's home. Mother had to be prompted consistently to praise and play with K.C. Despite her intervention and direction, the therapist did not see much progress in either the child or Mother's engagement with him. Although Mother was cooperative during sessions, the therapist saw no evidence that Mother continued to follow through with engagement tasks during the rest of the week. After K.C. was removed from the home and placed in foster care, the therapist continued to see him on a weekly basis with Foster Mother, with whom his progress has been "amazing." The child has become very verbal, controls his impulses better, and has made friends. While the

therapist planned to continue to work with Mother and the child together during visitations, Mother failed to appear for the majority of her visits with K.C. Accordingly, the therapist had only seen Mother four times after the child was removed. Mother showed no further improvement in her interactions with K.C. or insight into her parenting issues.

{¶20} Although Mother was offered weekly visitation, she attended only 20 out of 53 of those opportunities. Despite frequent encouragement by the caseworker and guardian ad litem to interact with the child, Mother remained unable to respond to the child. Mother did not initiate conversations with K.C., and she rarely responded to his questions, and then only if the child asked her something repeatedly. Mother's rare responses generally consisted of a single word. When the two were together, each played independently of the other in parallel play, rather than in interactive play. When asked what changes she would make if the child were returned to her care, Mother testified that she would continue to behave the same way she had always behaved with the child. Mother could not grasp the effect her lack of engagement with the child had on him. She believed that her lack of involvement with the child was merely a different but not harmful parenting style, as she simply viewed the child as independent. Although the guardian ad litem made numerous suggestions regarding programs in the community to continue to improve the child's social development, Mother refused to consider any of them.

{¶21} Based on clear and convincing evidence establishing ongoing concerns about Mother's ability to provide a nurturing, stimulating, and healthy environment for K.C., notwithstanding the agency's reasonable case planning and diligent efforts, Mother failed continuously and repeatedly to substantially remedy the conditions which caused the child to be placed outside of Mother's home. *See* R.C. 2151.414(E)(1). Moreover, clear and convincing evidence demonstrated that Mother continued to suffer from chronic mental illness, chronic

emotional illness, and/or intellectual disability so severe that she remained unable to provide an adequate permanent home for K.C. *See* R.C. 2151.414(E)(2). Mother had been receiving community services long before and throughout the pendency of this case to help her address her mental health and money management issues. All service providers and the guardian ad litem directed and redirected Mother regarding behaviors that would allow her to parent and provide for the basic and special needs of the child. Nevertheless, Mother continually failed to display any insight regarding either her own issues or the child's issues. In fact, Mother denied that there were any problems with her parenting. She steadfastly believed that she interacted appropriately with the child and could provide for his basic needs, even though she failed to recognize the need to interact with him, and provide stimulation and multiple meals per day for him. Under these circumstances, the juvenile court did not err by finding that K.C. could not be placed with either parent within a reasonable time or should not be placed with either parent. LCCS established the first prong of the permanent custody test.

{¶22} The juvenile court further found that an award of permanent custody was in the child's best interest.[4] Again, the factors the juvenile court must consider include the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e).

Custodial history of the child

{¶23} K.C. spent the first five-and-a-half years of his life in Mother's custody without his older siblings in the home. He was then removed and placed in foster care with a single

---

[4] Mother does not challenge the juvenile court's best interest finding as it relates to Father.

mother of Mother's same racial background. The child has been with Foster Mother since December 2016.

Interaction and interrelationships of the child

{¶24} While still in Mother's home, K.C. was referred to a pre-school intervention specialist who evaluated the child and determined that he required placement in a moderately intensive needs room where he would receive a lot of one-on-one attention in a highly structured teaching environment. When he entered the program, K.C. was nonverbal and incapable of engaging with other children. In addition to working with the child for 24 hours each week in the classroom, the teacher also frequently stopped by Mother's home, bringing toys and instructing Mother how to play and speak with the child. Although Mother was receptive to the teacher's guidance through direction and modeling appropriate behaviors, she did not follow through in the teacher's absence. Accordingly, while K.C.'s communication and social skills improved because of his participation in pre-school while in Mother's care, the child's progress was limited. After he was placed in foster care, however, K.C. made great progress. He became more verbal, interactive, and confident. The teacher attributed the child's progress in large part on his coming to school "ready to learn" when in Foster Mother's care. Specifically, the child had been fed and was wearing clean, dry clothing, unlike the situation when he was with Mother.

{¶25} K.C. became very comfortable in his foster home. He and Foster Mother share a close bond and are very engaged with one another. The child refers to her as "mom," while he refers to Mother by her first name. Foster Mother works to engage the child by asking him questions, modeling behaviors for him, engaging in interactive play, and showing an interest in him. K.C. has become a vocal child who has developed friendships with other children in school. He has attended summer camps and other activities with great interest. Moreover, the

child attempts to engage Mother at visitations by asking her questions. Nevertheless, Mother does not respond and acts independently of the child, rather than interactively. Although the guardian reported that Mother loves the child, the two continue to have very little interaction or bond. K.C. has no relationship with Father, his two older sisters, or his maternal grandmother who has custody of his sisters.

Wishes of the child

{¶26} The guardian ad litem reported that K.C. is too young to express his wishes or understand the implications of any statement he would make regarding his custody. Nevertheless, the guardian testified that the child's behaviors and interactions give an indication of his wishes. The guardian recommended that it would be in the best interest of K.C. that he be placed in the permanent custody of LCCS even though that would terminate his relationship with Mother. The guardian was adamant that K.C. does not have the hope of a purposeful future in Mother's care, as she remains either unable or unwilling to interact with him appropriately.

The child's need for a legally secure permanent placement

{¶27} K.C. was removed from an environment of isolation from the outside world, a lack of communication and affection, and where he lacked emotional and nutritional sustenance, due to Mother's mental health and cognitive deficits which severely limited her ability to care for the child. Exposure to that environment resulted in significant speech, socio-emotional, and adaptive delays. Despite long-term support from multiple service providers for Mother, Mother continues to lack insight regarding her own issues, as well as those of the child. Mother does not believe that K.C. has special needs, and she testified that she would not change the way she relates to him, if he were returned to her care.

{¶28} On the other hand, K.C. has thrived in Foster Mother's home, where all of his basic and special needs are met. Foster Mother has demonstrated the ability and willingness to adopt the child. Mother testified that she wants K.C. home with her and she believes that she could take care of the child as long as he receives welfare benefits. Nevertheless, she stated that if that was not possible, then she wanted the child to be in a stable home. Mother indicated a preference that K.C. be in a home with a parent of a particular ethnic and racial background, and she acknowledged that Foster Mother fit those criteria. In addition, she acknowledged that the child's needs were being met in the foster home and that she was "okay" with K.C. being there. Foster Mother indicated a willingness to provide occasional photos of the child to Mother.

{¶29} The guardian ad litem recommended permanent custody as in the best interest of the child. The LCCS caseworker testified that the benefits of permanent custody and adoption, whereby the child would have consistent healthcare, food, participation in school, nurturing and communication, and have his special needs met, far outweighed any harm of severing the Mother-child bond.

Applicability of R.C. 2151.414(E)(7)-(11) factors

{¶30} While Father had abandoned the child pursuant to R.C. 2151.414(E)(10), none of the subsection (E)(7)-(11) factors are applicable to Mother.

Conclusion

{¶31} The record demonstrates that the juvenile court did not clearly lose its way and create a manifest miscarriage of justice in finding that it was in the best interest of K.C. to be placed in the permanent custody of LCCS. *See Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. The clear and convincing evidence supports the finding that Mother is unable to provide an appropriate permanent home for K.C. wherein both his basic and special needs would be met.

Mother's lack of insight arising from her chronic mental health issues and cognitive deficits prevent her from providing a nurturing and healthy environment for K.C. Mother does not recognize the need to communicate and engage with the child, or the need to feed him more than once per day. She steadfastly asserted that she would not modify her behaviors with the child, should he be returned to her care. Because K.C. suffered significant speech, socio-emotional, and adaptive delays as a result of that environment, the juvenile court did not err by finding that an award of permanent custody was in the best interest of the child.

{¶32} The juvenile court's termination of all parental rights and its award of permanent custody to LCCS were not against the manifest weight of the evidence. Mother's assignment of error is overruled.

### III.

{¶33} Mother's sole assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

DENISE E. FERGUSON, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and PREETHI KISHMAN, Assistant Prosecuting Attorney, for Appellee.

ELAINE CARLIN, Guardian ad Litem.

MICHAEL TOWNE, Guardain ad Litem.